**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| ASSURED TESTING LABORATORIES LLC, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 25-12336-BEM |
| PERKINELMER HEALTH SCIENCES, INC., *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTIONS TO DISMISS**

**MURPHY, J.**

Plaintiffs brought this action, alleging a conspiracy to commit fraud centered around

Defendants' sale of allegedly defective cannabis testing lab instruments.[1]  Before the Court now

---

[1] Plaintiffs are 39 cannabis testing laboratories that operate across the United States and Canada (the "Lab Plaintiffs"), 1 lab landlord, and 1 lab vendor.  Dkt. 107 ("Complaint" or "Compl.") ¶¶ 3, 14–55.  The Lab Plaintiffs are Assured Testing Laboratories LLC; Plant Safe, LLC; Evio, Inc.; Nature Safe Labs, Inc.; Pride Analytics and Consulting LLC; NCALC, LLC d/b/a The Higher Commitment Analytical; High Sierra Analytics, Inc.; 2 River Labs; American Biotech Testing, Inc.; American Biotech Laboratories, Inc.; SC Laboratories Oregon LLC; SC Laboratories California, LLC; CB Labs Novato, LLC; CB Labs Santa Ana, LLC; CanMedLabs LLC; Enve Analytics LLC; Indicative-Testing LLC; Aries Analytic LLC; Agricor Laboratories MI, Inc. f/k/a Cann-Lab LLC; The Spott Laboratory; Scepter Lab LLC; Higher Testing, LLC; Jasper Analytical Laboratory, LLC; Rose City Laboratories LLC; Pinnacle Analytics, LLC; Bluebonnet Labs, LLC; First THC Company LLC; High North, Inc.; Ontario Inc.; Pura Analytical Labs; Green Analytics MD, LLC; Green Analytics NY, LLC; Green Analytics WV, LLC; Green Analytics MA, LLC; OK Analytical; Certified Testing & Data, LLC; Delta9 Labs, LLC; Nascient, LLC; and Nascient I, LLC. *Id.* ¶¶ 14–32, 34–53.  The two remaining plaintiffs are Vassar Acquisitions Property Management, LLC, which alleges it purchased instruments that its tenant Atomic Labs ordered for Atomic's lab, *id.* ¶¶ 33, 713–14, and Tagleaf, Inc., which develops laboratory information systems, *id.* ¶¶ 55, 892.

are motions to dismiss from two sets of Defendants.[2]  For the reasons set forth below, the Court will grant both motions and remand the remaining claims to state court.

## I.      Background

### A.      Factual Background

The following facts are drawn from Plaintiffs' second amended complaint, Dkt. 107 ("Complaint" or "Compl."), and are accepted as true for purposes of resolving Defendants' motions to dismiss.[3]

#### 1.      Lab Instrument Sales

PerkinElmer Health Sciences, Inc. ("PHS") sold complex analytical instruments to cannabis testing laboratories in the United States and Canada.  Compl. ¶¶ 107, 130.  PHS is now known as Revvity Health Sciences, Inc. ("RHS").[4]  These instruments included the QSight LC-MS/MS (models 210, 220 and 420) for pesticides and mycotoxins, the Clarus GC-MS for residual solvents and terpenes, the Flexar HPLC and LC300 HPLC for cannabinoids, and the NexION ICP-MS (models 1000 and 2000B) for heavy metals.  *Id.* ¶ 131.  According to Plaintiffs, PHS employees and management fraudulently misrepresented the capabilities of these lab

---

[2] The first motion to dismiss was filed by PerkinElmer Health Sciences, Inc.; Revvity Health Sciences, Inc.; PerkinElmer U.S. LLC; Prahlad Singh; Alexis P. Michas; Peter Barrett; Samuel Chapin; Sylvie Gregoire; Toby Astill; Carl Carnegey; Kevin Culver; Avinash Dalmia; Melanie Emmanuel; Joel Goldberg; Joe Greenwood; Margaret Guthrie; Jacob Jalali; Richard Jezykowski; John Luck; Mark Greenbaum; Alexander Maitan; Mark McCue; Corey Morcombe; James Riley Neuman; Feng Qin (incorrectly named in the Amended Complaint as Qin Feng); Tony Rhoden; Charlie Schmidt; Jason Weisenseel; Robert Friel, and Pascal Witz (collectively, the "PerkinElmer Defendants").  Dkt. 124.  Note that the Court granted the assented-to motion to allow Witz to join the motion to dismiss on the record during the April 14, 2026 hearing.  *See* Dkts. 166, 170.  The second motion to dismiss was filed by New Mountain Capital, LLC; New Mountain Partners VI, LP; and PerkinElmer Topco, L.L.C. (collectively, the "New Mountain Defendants").  Dkt. 126.  It is not clear whether Frank Whitney has been served yet.  *See* Dkt. 121 (granting motion to extend time for service until March 6, 2026).  The two remaining Defendants, Juniper Analytics, LLC and Emerald Scientific, LLC, have defaulted.  Dkts. 139–40 (clerk's entry of default).

[3] The second amended complaint is 232 pages and consists of over 1000 paragraphs.  *See generally* Compl. Accordingly, the Court provides only an abbreviated overview here, with additional facts included in the analysis as needed.

[4] The parties agree that while named separately in the Complaint, PHS and RHS are not distinct entities.  *See, e.g.*, Dkt. 145 at 4 n.2; Compl. ¶ 58.

instruments and the status of their standard operating procedures ("SOPs"), claiming that instruments were implementation-ready and constituted a fully "turnkey" solution, with well-developed and validated SOPs. *Id.* ¶¶ 107–15, 121–29, 132–37, 152–54. Plaintiffs allege that as early as 2019, PHS was aware that its claims regarding the lab instruments were false. *Id.* ¶¶ 116, 164, 913; *see also id.* ¶¶ 107–20, 165–67 (alleging additional instances of knowledge of the false claims). Plaintiffs have alleged that various executives, board members, and employees of PHS were aware of and involved in the purported fraudulent scheme. *Id.* ¶¶ 66–95, 97, 212–91, 298–301.

All but two Plaintiffs operated independent cannabis testing labs that purchased at least one instrument from PHS between 2017 and 2022 (the "Lab Plaintiffs"). *Id.* ¶¶ 14–32, 34–53, 103. One additional Plaintiff, Vassar Acquisitions Property Management, LLC ("VAPM"), alleges it purchased instruments that its tenant Atomic Labs ordered for Atomic's lab. *Id.* ¶¶ 33, 713–14. The Lab Plaintiffs and VAPM contend that they only purchased the lab instruments due to PHS's fraudulent representations concerning the instruments' capabilities. *Id.* ¶¶ 130–38, 170–71, 312–916. The Lab Plaintiffs and VAPM also allege that they each experienced "routine issues with shipping, installation, training and support." *Id.* ¶ 181.[5]

According to Plaintiffs, PHS concealed the truth about its lab instruments' capabilities from Plaintiffs, including by claiming that the deficiencies were caused by "operator error" and that other customers did not experience similar issues. *Id.* ¶¶ 6, 927, 930. Plaintiffs learned of this alleged falsity when they accessed public litigation records from other lawsuits against PHS in 2024. *Id.* ¶¶ 8, 928.

---

[5] The final Plaintiff, Tagleaf, Inc., is a software company. Compl. ¶ 55. There are no allegations that it purchased any lab instruments from PHS. *See, e.g.*, *id.* ¶¶ 889–95 (alleging Tagleaf, Inc. was injured by PHS falsely representing the lab instruments as "Tagleaf-integrated" without authorization, damaging customer relationships).

### 2.    Other Defendants' Actions

In 2023, PHS spun off certain of its business assets to New Mountain Capital, LLC ("New Mountain") and rebranded the remainder of PHS as RHS.  *Id.* ¶¶ 10, 58, 191.  "New Mountain is the private equity management and advisory entity controlling investments completed on behalf of New Mountain Capital Partners VI, LP [("Capital Partners")] (the entity which holds New Mountain's direct economic interest in PE-US)."  *Id.* ¶ 61; *see also id.* ¶¶ 191, 204.  New Mountain then formed PerkinElmer U.S. LLC ("PE-US," and together with PHS and RHS, "PerkinElmer") to acquire, *inter alia*, PHS's ongoing sales and service operations with respect to the lab instruments.  *Id.* ¶ 60.  Plaintiffs describe PE-US as "the successor-in-interest to PHS's business operations, including its liabilities," *id.*, and have alleged that PE-US continues to harm Plaintiffs, *id.* ¶ 192.  Perkinelmer Topco, L.P. ("Topco," and together with New Mountain and Capital Partners, the "New Mountain Defendants") is the alleged "financial and managerial bridge between [New Mountain] and the operational entities that continued to market and service PerkinElmer's cannabis-testing solutions after 2023."  *Id.* ¶ 96; *see also id.* ¶¶ 198, 292–97.

Juniper Analytics, LLC ("Juniper") is "a cannabis laboratory business that collaborated with PHS in the development, promotion, and sale of cannabis testing."  *Id.* ¶ 205.  Under a 2018 collaboration agreement, Juniper and PHS worked together on "method development projects," through which Juniper received "cash payments and free instrumentation from PHS in exchange for [Juniper's] promotional support."  *Id.* ¶¶ 205–06; *see also* Dkt. 107-11.  Plaintiffs allege that Juniper "serv[ed] as a reference laboratory for PHS's development of pesticide and other cannabis testing SOPs" and "publicly endorsed and promoted PHS's cannabis testing solutions as turnkey and regulatory-compliant" "[d]espite possessing first-hand knowledge that PHS's SOPs did *not* function as represented."  Compl. ¶ 205 (emphasis in original); *see also id.* ¶¶ 206, 944.

According to Plaintiffs, Emerald Scientific, LLC ("Emerald") "promoted PHS's cannabis testing solutions as turnkey, validated, and regulatory-compliant [and] sold PHS's instruments and SOP packages directly to multiple plaintiffs in this action." *Id.* ¶ 207; *see also id.* ¶¶ 890, 944. Emerald allegedly conducted this false promotion through sales, supplies of "consumables, reagents, and laboratory supplies specifically tied to PHS's marketed turnkey SOPs," and statements during conferences and webinars Emerald hosted. *Id.* ¶¶ 207–208. On December 23, 2019, Emerald announced a partnership with PHS, through which Emerald allegedly "further promoted that PHS's Emerald Proficiency Test results validated their SOPs' accuracy, despite having internal knowledge of widespread product deficiencies." *Id.* ¶ 209. Plaintiffs further allege that "by selling badges and partnering with PerkinElmer for cross-marketing, Emerald provided cover that PerkinElmer then used to reassure investors and customers." *Id.* ¶ 885.

### B.    **Procedural Background**

On January 16, 2025, twenty-six Plaintiffs filed a complaint in state court against PHS, RHS, and PE-US. Dkt. 2 at 8–121. After the state court complaint was amended to assert a new cause of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against the original Defendants and dozens of new ones, Defendants removed the case to this Court on August 21, 2025. Dkt. 1. On December 17, 2025, Plaintiffs filed an amended complaint to add both additional plaintiffs and additional facts in support of their claims. Compl.[6] On January 30, 2026, the PerkinElmer Defendants and the New Mountain Defendants each moved to dismiss certain claims against them. Dkts. 124, 126; *see also* Dkts. 125, 127,

---

[6] The Court granted leave to file the amended complaint after Defendants indicated their lack of opposition during a status conference. *See* Dkt. 106 (clerk's notes).

145–46, 151–52.   The Court held a hearing on April 14, 2026, and took the matter under advisement.

## II.     Standard of Review

Courts analyzing claims under Federal Rule of Civil Procedure 12(b)(6) must determine whether a plaintiff's factual allegations—disregarding all "conclusory" statements—"state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   In making its determination, a court must "accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor." *Grajales v. P.R. Ports Authority*, 682 F.3d 40, 44 (1st Cir. 2012).   At the pleading stage, plaintiffs need not demonstrate that they are likely to prevail, but "[their] claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'"  *García-Catalán v. United States*, 734 F.3d 100, 102–03 (1st Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).   "The inquiry is usually limited to the facts alleged in the complaint, incorporated into the complaint, or susceptible to judicial notice," *Whelden v. U.S. Bank Nat'l Ass'n*, 494 F. Supp. 3d 68, 73 (D. Mass. 2020) (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)), "but the court may also consider other documents the authenticity of which is not disputed by the parties, documents central to the plaintiff's claim, and documents sufficiently referred to in the complaint," *id.* (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)).

## III.    Discussion

In two motions, Defendants have collectively moved to dismiss the majority of claims against them.[7]

---

[7] The two motions cover all Defendants who have been served other than Juniper and Emerald, who have defaulted in this action.  *See* Dkts. 139–40.

## A.    RICO Claim (Count I)

Both sets of Defendants argue that Count I should be dismissed against all Defendants for failing to state a claim.  "To state a civil RICO claim, a plaintiff must allege '(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity.'"  *Humana Inc. v. Biogen, Inc.*, 126 F.4th 94, 103 (1st Cir. 2025) [hereinafter *Humana II*] (quoting *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 233 (1st Cir. 2003)).  "[A]t a bare minimum, an allegation of RICO liability under 1962(c) must indicate how the defendant used the alleged enterprise to facilitate the fraudulent conduct."  *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 449 (1st Cir. 2000) (alteration in original) (quoting *Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1148 (10th Cir. 1998)).

The enterprise requirement "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle v. United States*, 556 U.S. 938, 946 (2009). Further, Plaintiffs must plead that Defendants "associated together for a common illegal purpose as opposed to merely conducting their business in parallel."  *Ezell v. Lexington Ins. Co.*, 335 F. Supp. 3d 91, 96 (D. Mass. 2018) (citing *Boyle*, 556 U.S. at 946), *aff'd*, 926 F.3d 48 (1st Cir. 2019); *see also Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) ("Rather, where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular criminal course of conduct.").  Here, the Court concludes that Plaintiffs have failed to sufficiently plead a RICO enterprise and thus Count I must be dismissed as to all Defendants.[8]

---

[8] Both sets of Defendants raise additional challenges to the RICO claim.  Because the Court concludes that Plaintiffs failed to plead the required RICO enterprise, the Court need not and does not address the remaining arguments.

### 1.    Juniper and Emerald

Plaintiffs argue that because Juniper and Emerald both defaulted, resulting in the facts alleged against them being deemed admitted, "the RICO enterprise is proven (and, at a minimum, sufficiently well plead for purposes of [PHS]'s Motion) to include independent third parties." Dkt. 145 at 14–15.  But Plaintiffs overstate the effect of Juniper's and Emerald's default.  First, this admission does not bind the remaining Defendants, only the defaulting parties.  *See, e.g.*, *Franco v. Selective Ins. Co.*, 184 F.3d 4, 9 n.3 (1st Cir. 1999) ("*A party who defaults* is taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability." (emphasis added)).  Second, even when a party defaults, on a motion for a default judgment, it is appropriate to independently "examine a plaintiff's complaint, taking all well-pleaded factual allegations as true, to determine whether it alleges a cause of action." *Ramos-Falcon v. Autoridad de Energia Electrica*, 301 F.3d 1, 2 (1st Cir. 2002); *see also Universitas Educ., LLC v. Granderson*, 98 F.4th 357, 377 (1st Cir. 2024) (quoting *Ramos-Falcon*, 301 F.3d at 2) (same); *IDEXX Distrib. Inc. v. Daniel A. Lauridia DVM PC*, 2020 WL 265194, at *1 (D. Me. Jan. 17, 2020) ("[T]he party in default does not concede that the factual allegations suffice to establish liability.  The Court must, therefore, be persuaded that the facts set forth in the complaint support the entry of judgment on one or more cognizable claims.").

Here, Plaintiffs' allegations against Juniper and Emerald fail to plausibly plead a RICO enterprise.  Plaintiffs allege that Juniper served as a reference laboratory to help PHS develop SOPs and endorsed the lab instruments despite knowing the instruments did not function in accordance with the SOPs, *e.g.*, Compl. ¶ 205, and that Emerald promoted and sold PHS's instruments despite knowing they did not function as represented, *id.* ¶¶ 207–10.  But for the purpose of alleging a RICO enterprise, it is not sufficient to allege only that Juniper and Emerald knew about problems with the PHS instruments and SOPs and still promoted and/or sold the

instruments on PHS's behalf. *See Wilson v. Prescott*, 2025 WL 3078870, at *7 (D. Me. Nov. 4, 2025) ("Plaintiff's conclusory allegation that the others had some degree of knowledge about [one defendant's] conduct is insufficient to establish the requisite conspiracy, participation, or interest in the enterprise." (citing *Schofield v. First Commodity Corp. of Bos.*, 793 F.2d 28, 32–33 (1st Cir. 1986))); *see also Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009) ("The [RICO] statute does not penalize tangential involvement in an enterprise; a plaintiff must plead and prove that a defendant took some part in directing or conducting the alleged 'enterprise' such that it 'participate[d] in the operation or management of the enterprise itself.'" (second alteration in original) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993))). The allegations related to Juniper and Emerald do not demonstrate that either Defendant took some action to operate or manage the enterprise itself, rather than merely conducting their own affairs. *See Reves,* 507 U.S. at 185 ("[L]iability [under RICO] depends on showing that the defendants conducted or participated in the conduct of the "*enterprise's* affairs," not just their *own* affairs" (emphasis in original)); *Crichton*, 576 F.3d at 399 ("Allegations that a defendant had a business relationship with the putative RICO enterprise or that a defendant performed services for that enterprise do not suffice.") (concluding that allegations that amounted to "existence of the marketing relationship" failed to state a RICO claim).

The Complaint also lacks allegations about Juniper and Emerald from which the Court can infer they shared a common purpose to defraud. *See United States v. Cianci*, 378 F.3d 71, 84 (1st Cir. 2004) (affirming jury instruction stating that "it is necessary to show that all members of the alleged enterprise shared a common purpose"); *Ryan v. Clemente*, 901 F.2d 177, 180 (1st Cir. 1990) (Breyer, J.) (noting that "although much about the RICO statute is not clear, it is very clear that those who are 'associates' . . . of a criminal enterprise must share a 'common purpose'"). The

innocent desire to make money cannot constitute a common purpose under RICO. *See Cisneros*, 972 F.3d at 1211–12 ("Rather, where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular criminal course of conduct."); *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 307 F. Supp. 2d 196, 205 (D. Mass. 2004) (explaining that  that the common purpose of making a profit "without a shared illegal purpose to defraud . . . would not support a claim of RICO enterprise").  Plaintiffs allege nothing more than conclusory statements that Juniper and Emerald did anything to "orchestrate the fraud" or were aware of PHS's alleged criminal conduct as to share a common purpose, as opposed to conducting normal business transactions with PHS.  *See, e.g.*, *MyFreeMedicine.com LLC v. Alpine Invs.*, 2010 WL 816649, at *9 (D. Me. Mar. 4, 2010) ("There must be some indication that [the defendant] either engaged in the predicate acts himself or knew that someone else was going to engage in those acts on behalf of the enterprise of which he was allegedly a part."), *report and recommendation adopted*, 739 F. Supp. 2d 8 (D. Me. 2010); *see also Crichton*, 576 F.3d at 399–400 (holding that "[a]llegations that a defendant had a business relationship with the putative RICO enterprise or that a defendant performed [marketing] services for that enterprise do not suffice," and thus all that was alleged was a "fraud perpetrated by [the defendant], not an association-in-fact enterprise directed and controlled by [the defendant]").

### 2. Remaining Defendants

The allegations against the remaining Defendants also fail to plead a RICO enterprise. Without Juniper and Emerald, the alleged enterprise is comprised solely of related corporate entities or employees, affiliates, and agents, many of whom are not alleged to have acted concurrently.  Plaintiffs describe the "common purpose" of the alleged enterprise as the "fraudulent marketing of cannabis testing instruments as 'turnkey' and regulatory-compliant to

maximize sales, then conceal[ing] systemic failures to extend the revenue stream." Dkt. 145 at 11 (citing Compl. ¶¶ 3–4, 940, 950–51).

Plaintiffs allege that PE-US "has continued to harm Plaintiffs by refusing parts and service to plaintiffs after bringing fraud claims, and by intimidating and threating other victims . . . [that] if they pursue relief based on claims of fraud, they will be refused parts and service." Compl. ¶ 192. Similarly, Plaintiffs allege that the New Mountain Defendants "[took] no action to prevent or interrupt PE-US's concealment and continuation of its fraudulent conduct." *E.g.*, *id.* ¶¶ 191–204. Such an allegation fails to plead a "continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948. According to Plaintiffs, PHS engaged in the sale of analytical instruments in the cannabis space between 2017 and 2022, before "winding down in 2023" upon the sale of that business, now housed in PE-US. Compl. ¶¶ 1, 58, 60. Plaintiffs do not and cannot allege that PE-US or the New Mountain Defendants associated with PHS in an ongoing enterprise, as they allege that "PHS abruptly shuttered its cannabis division at the end of 2022," *id.* ¶ 308, when PE-US and the New Mountain Defendants purportedly began their involvement in the alleged enterprise.[9] There can be no "common purpose" between companies who are not operating at the same time.[10] *Cf. Ezell*, 286 F. Supp. 3d at 298 ("Those allegations do not, however, rise to the level of an association-in-fact enterprise because the complaint does not state how the

---

[9] Plaintiffs specifically describe PE-US as PHS's "successor." *See, e.g.*, Dkt. 145 at 15.

[10] Additionally, Plaintiffs fail to allege that the New Mountain Defendants "participate[d] in the operation or management of an enterprise through a pattern of racketeering activity." *Reves*, 507 U.S. at 184. Plaintiffs provide no authority for their contention that failing to prevent PE-US's conduct constitutes participation in the alleged fraud, especially where PE-US is not the enterprise. *See United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994) ("[W]hile [the accountants in *Reves*] were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command through which the enterprise's affairs were conducted."); *see also Walter v. Drayson*, 538 F.3d 1244, 1247–48 (9th Cir. 2008) (explaining that allegations that a defendant "carried on" or "failed to stop illegal activity" cannot constitute the requisite direction or control for liability under 18 U.S.C. § 1962(c)). Nor do Plaintiffs identify any authority for the contention that the "withholding of service in order to silence fraud victims constitutes ongoing racketeering activities," Dkt. 145 at 12, where they do not allege that PE-US had any obligation to provide such services.

11

[defendants] collaborated with each other or if the [defendants] were even aware of each other's participation in the alleged scheme."). Put simply, an enterprise cannot be considered "ongoing" or a "continuing unit" where its members are wholly replaced by new entities that merely fail to remedy earlier alleged fraud. *Cf. Cianci*, 378 F.3d at 86 n.4 (affirming jury instruction stating that "[a]n enterprise may exist even though individual members come and go *as long as it continues in an essentially unchanged form during substantially the entire period alleged*" (emphasis added)).

Finally, Plaintiffs cannot plead a RICO enterprise by simply naming various individuals affiliated or employed by PHS; employees and an employer cannot together form a conspiracy. "Where a corporation is alleged to be a liable 'person,' '[t]he distinction requirement is not satisfied by merely naming a corporation and its employees, affiliates, and agents as an association-in-fact.'" *Liberty Mut. Ins. Co. v. Aftermath Servs. LLC*, 2023 WL 5435878, at *3 (D. Mass. Aug. 23, 2023) (alteration in original) (quoting *Mear v. Sun Life Assurance Co. of Can. (U.S.)/Keyport Life Ins. Co.*, 2008 WL 245217, at *9 (D. Mass. Jan. 24, 2008)); *see also Odishelidze v. Aetna Life & Cas. Co.*, 853 F.2d 21, 23 (1st Cir. 1988) ("[C]ompanies and their officers or employees (the named defendants) cannot be the entity that conducts its own affairs through a pattern of racketeering activity.").

As such, Count I must be dismissed entirely for failure to plead a RICO enterprise.[11]

## B.    PerkinElmer Defendants' Motion

The PerkinElmer Defendants also seek to dismiss certain claims raised by various subsets of Plaintiffs. The Court addresses each argument in turn.

---

[11] Accordingly, the Court also DENIES Plaintiffs' motions for default judgment as to Juniper and Emerald and dismisses Count I as to Juniper and Emerald as well. Dkts. 155–56; *see Gentle Wind Project v. Garvey*, 407 F. Supp. 2d 280, 281 (D. Me. 2006) (denying motion for default judgment and dismissing claims against defaulted RICO defendant to avoid inconsistent judgments after granting summary judgment on a RICO claim to non-defaulted defendants in an alleged association-in-fact enterprise).

### 1.    <u>Rule 9(b) (Counts I, II, VI, and VII)</u>

The PerkinElmer Defendants argue that twenty-six Plaintiffs failed to allege fraud with the requisite particularity under Federal Rule of Civil Procedure 9(b) ("Rule 9(b)").[12]  Dkt. 125 at 12–22.  There is no dispute that Count I (civil RICO), Count II (fraudulent inducement), Count VI (Chapter 93A), and Count VII (various states' consumer protection laws) are each subject to Rule 9(b)'s heightened pleading requirements.  *Id.* at 12; Dkt. 145 at 16; *see also Humana, Inc. v. Biogen, Inc.*, 666 F. Supp. 3d 135, 154 (D. Mass. 2023) [hereinafter *Humana I*] ("Civil RICO claims based on predicates of mail or wire fraud must meet the heightened pleading standard of Rule 9(b)."), *aff'd*, 126 F.4th 94 (1st Cir. 2025); *Mulder v. Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 21–22 (1st Cir. 2017) (explaining that "Rule 9(b)'s requirements apply to both general claims of fraud and also to associated claims, . . . where the core allegations effectively charge fraud" and concluding that fraud-based Chapter 93A claims are subject to the heightened pleading requirement (citations and internal quotation marks omitted)).  Rule 9(b) requires that "the pleader . . . go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communications perpetrating that fraud."  *Cordero-Hernandez v. Hernandez-Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006) (quoting *N. Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 43 (1st Cir. 2001)).

Plaintiffs contend that "Rule 9(b) permits plaintiffs to plead fraud by category and role rather than requiring verbatim recitations of each individual communication."  Dkt. 145 at 19.  Not

---

[12] The twenty-six Plaintiffs are Plant Safe, LLC; Pride Analytics and Consulting LLC; NCALC LLC d/b/a The Higher Commitment Analytical; 2 River Labs; SC Laboratories California, LLC; CB Labs Novato, LLC; CB Labs Santa Ana, LLC; CanMedLabs LLC; Enve Analytics LLC; Aries Analytic L.L.C.; Agricor Laboratories MI, Inc. f/k/a Cann-Lab LLC; Vassar Acquisitions Property Management LLC; The Spott Laboratory; Scepter Lab LLC; Higher Testing, LLC; Jasper Analytical Laboratory, LLC; Rose City Laboratories; BlueBonnet Labs, LLC; First THC Company LLC; Pura Analytical Labs; Green Analytics MD, LLC; Green Analytics New York, LLC; Green Analytics West Virginia, LLC; Green Analytics Massachusetts, LLC; OK Analytical; and Tagleaf, Inc.  *See* Dkt. 124 at 1–2.

only do Plaintiffs fail to identify any authority for this contention—nor is this Court aware of any—but such a pleading by category directly contradicts the requirements and purposes of Rule 9(b). *See Humana II*, 126 F.4th at 103–04 (explaining that Rule 9(b) requires "particularity as to the 'who,' 'what," 'where,' and 'when' giving rise to the fraud");[13] *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) ("Rule 9 imposes a heightened pleading requirement for allegations of fraud in order to give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery.").

Here, Plaintiffs allege that PHS conducted a fraudulent marketing scheme that they claim induced each Plaintiff to purchase lab instruments, but for many of the Plaintiffs, the allegations lack the requisite details such as where, when, or by whom any specific misrepresentation was made. As an example, Plaintiff Pride Analytics and Consulting LLC alleges only that "Defendant [Tony] Rhoden made a series of written and verbal representations to Pride that the purchase of PHS cannabis testing instruments would include turnkey SOPs that would meet all regulatory requirements for cannabis testing in California." Compl. ¶ 429. Notably, such an allegation lacks any detail on where and when such statements were made. Similarly, Plaintiff Enve Analytics LLC alleges only that, sometime during or after June 2019:

---

[13] The First Circuit explicitly rejected the argument that Rule 9(b) merely requires pleading sufficient facts to put a defendant on notice of the claims and "file a responsive pleading," stating that it "is not the standard." *Humana II*, 126 F.4th at 103–04.

> Dr. Perrone [of Enve Analytics LLC] thereafter connected with several members of the PHS team. PHS had many sales representatives discuss with Dr. Perrone, including those mentioned above, additionally Chris Marshall, Terry Potter. Over the course of these conversations, PHS employees made representations that Dr. Perrone would be getting turnkey SOPs and instruments, a "lab in a box" is how it was described and sold to Dr. Perrone. The instruments PHS sold would be plug and play and Dr. Perrone would be able to quickly set up his lab and capitalize on being the first licensed lab in Maine.

Compl. ¶ 648.

This allegation fails to describe where and when these alleged misrepresentations were made, nor does it allege by whom each statement was made. Accordingly, for substantially the reasons set forth by the PerkinElmer Defendants, *see* Dkt. 125 at 13–21; Dkt. 151 at 8–9, the Court concludes that twenty-six Plaintiffs have failed to plead fraud with particularity and thus their claims under Counts I, II, VI, and VII must be dismissed.[14]

### 2.    Consumer Protection Claims (Counts VI and VII)

#### a.    Chapter 93A

Defendants argue that all the Chapter 93A claims—other than those of Assured Testing Laboratories LLC ("Assured Testing")—should be dismissed because the claims did not occur primarily and substantially in Massachusetts. Dkt. 125 at 30–33. To state a viable Chapter 93A claim, "the unfair or deceptive conduct must 'occur primarily and substantially within [Massachusetts].'" *Parexel Int'l LLC v. PrisymID Ltd.*, 2024 WL 3471930, at *6 (D. Mass. July 19, 2024) (alteration in original) (quoting *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 52 (1st Cir. 1998)). "Conduct occurs 'primarily and substantially' within Massachusetts when 'the center of gravity of the circumstances that give rise to the claim is primarily and substantially

---

[14] The Court notes that even the extensive charts Plaintiffs provided purporting to detail the particulars of the fraud lack the required specificity, frequently citing only vague date ranges, *e.g.* Dkt. 145 at 23 (describing the "when" as "[a]fter 2017"), or failing to state where the fraudulent conduct occurred, *e.g.*, *id.* at 22 (describing the "where" as "[d]irect communications with sales representatives, including in-person meetings"). Such allegations do not comport with Rule 9(b).

within the Commonwealth.'" *Id.* (quoting *Sonoran Scanners, Inc. v. PerkinElmer, Inc.*, 585 F.3d 535, 546 (1st Cir. 2009)). While this determination is "fact-intensive," *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 2014 WL 304070, at *5 (D. Mass. Jan. 28, 2014), it is nevertheless "a question of law," *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 194 (1st Cir. 2009).[15] There is no precise formula for the center of gravity analysis because a significant factor that exists in one case may not exist in another, *Kuwaiti Danish Comput. Co. v. Digit. Equip. Corp.*, 438 Mass. 459, 472–73 (Mass. 2003)), but "courts may consider where the defendant committed the deceptive acts and practices, where the plaintiff received and acted upon the deceptive or unfair statements, and the situs of the plaintiff's losses due to the unfair or deceptive acts or practices," *Parexel*, 2024 WL 3471930, at *7 (internal quotation marks omitted) (quoting *Reicher v. Berkshire Life Ins. Co. of Am.*, 2002 WL 31426758, at *2 (D. Mass. Oct. 29, 2002)).

Plaintiffs argue that they plead that PHS developed sales presentations, conducted marketing meetings, conceived a fraudulent scheme, and orchestrated a concealment strategy in Massachusetts. Dkt. 145 at 32–33. But Plaintiffs overstate their allegations. For example, Plaintiffs argue that they plead that: "Defendants developed their sales presentations (from

---

[15] Plaintiffs also argue that this element is not amendable to resolution on a motion to dismiss. Dkt. 145 at 32. But courts regularly dismiss Chapter 93A claims for failing to allege a center of gravity in Massachusetts. *See, e.g.*, *Crunchtime! Info. Sys., Inc. v. Frischs Rest., Inc.*, 768 F. Supp. 3d 183, 186 (D. Mass. 2025) (dismissing Chapter 93A claim for failing to allege that the "claim arose from activities 'primarily and substantially' in Massachusetts" where the complaint did not allege "specific facts having occurred in, or being related to, Massachusetts" and instead "discusse[d] various conduct that occurred between plaintiff and defendant without reference to place"); *Parexel*, 2024 WL 3471930, at *7 (dismissing Chapter 93A claim after finding insufficient for the center of gravity that plaintiff's headquarters were in Massachusetts, without allegations that the relevant business dealings occurred in Massachusetts); *Warren Env't, Inc. v. Source One Env't, Ltd.*, 2020 WL 1974256, at *11 (D. Mass. Apr. 24, 2020) (dismissing Chapter 93A claim because the alleged misconduct concerned patents and business dealings in Europe and Australia, even though plaintiff was located and suffered the harm in Massachusetts); *Evergreen*, 2014 WL 304070, at *4–5 (dismissing Chapter 93A claim because allegations that "some acts" occurred in Massachusetts failed to demonstrate that the "center of gravity" was "primarily and substantially" in Massachusetts, and "only two paragraphs . . . reference[d] actions or transactions occurring in Massachusetts"); *Acacia Commc'ns, Inc. v. ViaSat, Inc.*, 2018 WL 2050125, at *7 (Mass. Super. Ct. Mar. 22, 2018) (dismissing Chapter 93A claim because "[t]he only allegation concerning the nexus between the claim asserted and Massachusetts is that [plaintiff] has its corporate headquarters in the Commonwealth, and that is certainly insufficient").

16

Massachusetts), including the brochure attached to the SAC as Exhibit 1, participated in marketing meetings and had communications with Plaintiffs between 2017 and 2022, wherein PHSI staff made false representations about product functionality, validation, and regulatory compliance." *Id.* at 33 (citing Compl. ¶¶ 164–69, 950–51). But those paragraphs of the Complaint state:[16]

- "By no later than 2019, PHS was aware of serious and consistent regulatory and testing issues with the PHS Instruments, including but not limited to through the following notices:

    a. In July 2019, the California Bureau of Cannabis Control advised Nascient, and Nascient in turn advised PHS, of significant problems with PHS's instrumentation, methods, and data reporting.

    b. In September 2019, the California Bureau of Cannabis Control advised PHS that a lab (SCR Living) using PHS instrumentation was unable to test for certain analytes. SCR Living advised PHS of ongoing issues with Instrument functionality and with PHS's SOPs/methods.

    c. In September 2019, a lab (Certus) advised PHS that its SOPs did not satisfy California Bureau of Cannabis Control requirement for testing of pesticides and mycotoxins.

    d. In 2019, a lab (Excelbis Labs, LLC), advised PHS of persistent, ongoing issues with Instrument functionality and with PHS's SOPs/methods.

    e. In 2019, a lab (NCALC), advised PHS of persistent, ongoing issues with Instrument functionality and with PHS's SOPs/methods." Compl. ¶ 164 (footnote omitted).

- "Thereafter, in 2020 and following, PHS continued to be aware of serious and consistent regulatory and testing issues with the PHS Instruments and with the PHS SOPs/methods:

    a. In January 2020, Excelbis Labs, LLC advised JOHN LUCK, then PHS's Vice President, Americas, Sales & Service, of a series of issues Excelbis Labs, LLC had with the PHS Instruments, including the QSight 420, Clarus GC/MS, ICP/MS, and Flexar; Excelbis Labs, LLC, provided detailed feedback regarding representations made by PHS personnel, regarding issues with the Instruments and SOPs/methods, regarding delays caused by these issues.

---

[16] The Court includes these paragraphs in full, to highlight the lack of allegations regarding conduct *in Massachusetts*.

b.  In February 2020, Excelbis Labs, LLC, wrote to PRAHLAD SINGH, ALEXIS P. MICHAS, FRANK WHITNEY, PASCAL WITZ, PETER BARRETT, SAMUEL R. CHAPIN, SYLVIE GREGORIE, each an executive or board member of PHS, and advised each of the ongoing issues with PHS's Instruments and SOPs/methods with respect to cannabis testing.

That is, in February 2020, the CEO of PHS and members of its Board of Directors were placed on direct notice of the fraudulent conduct described in this pleading.  The CEO and board members were provided with a detailed, 15-page letter outlining evidence that PHS had knowingly sold instruments and methods that could not meet regulatory limits, had misled regulators, investors, and customers, and was engaged in a pattern of deceptive conduct that placed public health at risk. The letter identified specific PHS employees—including several defendants named in this lawsuit—as having participated in or concealed the fraudulent scheme. The letter warned that PHS's conduct constituted, inter alia, fraud and misrepresentation.

Neither the CEO nor the Board responded substantively.  Instead, PHS continued to market and sell the same defective systems using the same deceptive representations, and took no action to investigate, disclose, or mitigate the fraudulent conduct. PHS's failure to act—despite this direct and specific notice— underscores that the fraudulent conduct described in this lawsuit was tolerated and perpetuated under executive and board oversight.

c.  In 2020, Excelbis Labs, LLC, filed claims (C.D. Ca., Case No. 20-cv-00527), against PHS for: (i) fraud & deceit, intentional misrepresentation; (ii) fraud & deceit, negligent misrepresentation; (iii) fraud & deceit, suppression of facts; (iv) breach of implied warranty of merchantability; and, (v) breach of implied warranty of fitness for a particular purpose.  This lab provided a detailed explanation of its issues with PHS's Instruments and SOPs/methods.  (This lawsuit was later settled.)

d.  In 2020, SCR Living LLC, filed claims (C.D. Ca., Case No. 20-cv-2083), against PHS for (i) fraud & deceit, intentional misrepresentation; (ii) fraud & deceit, negligent misrepresentation; (iii) fraud & deceit, suppression of facts; (iv) breach of implied warranty of merchantability; (v) breach of implied warranty of fitness for a particular purpose; and, (vi) rescission and restitution.  This lab provided a detailed explanation of its issues with PHS's Instruments and SOPs/methods.  (This lawsuit was later settled.)

e.  In May 2020, a lab (High Sierra) informed PHS that the QSight was unable to properly test (or calibrate) for various pesticides.

f.  In 2021, Think20 Labs, LLC, filed claims (C.D. Ca., Case No. 21-cv-00541), against PHS for (i) fraud & deceit, intentional misrepresentation; (ii) fraud & deceit, negligent misrepresentation; (iii) fraud & deceit, suppression of facts; (iv) breach of implied warranty of merchantability; (v) breach of implied warranty of fitness for a particular purpose; and, (vi) rescission and restitution. This lab provided a detailed explanation of its issues with PHS's Instruments and SOPs/methods. (The fraud claims remain open, and this lawsuit is ongoing and will be set for trial in 2026.)

g.  In March 2021, with respect to the QSight, PHS staff advised Jeff Gray, of SC Labs, that PHS had identified deficiencies in meeting regulations in Massachusetts (for the testing of flower and concentrates for pesticides), Michigan (for the testing of concentrates for pesticides), Colorado (for the testing of concentrates for pesticides), and Florida (for the testing of flower and concentrates for pesticides); the purpose of this communication was potential SOP improvements.

h.  In March 2022, a lab (Scepter) advised PHS that the QSight it ordered never functioned properly, and did not work even for PHS's testing and setup personnel.

i.  In June 2022, a lab (Bluebonnet) asked PHS about a litany of issues, experience over the prior two years, and asked whether this experience was normal." *Id.* ¶ 165 (footnotes omitted).

- "On February 28, 2020, counsel for Excelbis Labs, sent a detailed letter to PerkinElmer's Chief Executive Officer, General Counsel, and Board of Directors. In the correspondence, counsel warned PerkinElmer that senior management and sales staff (John Luck, Mark Greenbaum, Cory Morcombe, Charlie Schmidt and Tony Rhoden) had engaged in coordinated fraud against Excelbis and other customers. The letter states '[t]here is serious and alarming misconduct by Senior Management and I believe it's my duty to put you on notice,' and highlighted reputational and investor risks. Despite receiving explicit written notice of fraud and risk in February 2020, PerkinElmer continued the same deceptive practices, marketing its systems as 'turnkey' and 'compliant' and inducing numerous additional laboratories to purchase the same instruments and methods between 2020-2023; this demonstrates intentional misconduct, and ratification of that conduct by senior leadership." *Id.* ¶ 166 (alterations in original).

19

- "Internally, in addition to receiving the various specific notices and complaints described above, PHS personnel were explicitly acknowledging no later than January 2021, that, contrary to PHS's representations that the PHS Instruments would provide purchasers with a complete SOP for testing, the PHS Instruments it was marketing and selling could not meet certain state testing standards." *Id.* ¶ 167 (footnote omitted).

- "PHS never informed any of the Labs of notices from regulators or third party labs regarding deficiencies and failures of the PHS Instruments in the course of any of PHS's sales or marketing communications. Instead, the Labs collectively only first learned of these material omissions in 2024 through their review of publicly filed documents filed in lawsuits against PHS in other jurisdictions." *Id.* ¶ 168.

- "PHS never informed any of the Labs of its knowledge, and internal acknowledgement, regarding the systemic deficiencies and failures of the PHS Instruments in the course of any of PHS's sales or marketing communications. Instead, the Labs collectively only first learned of these material omissions and misstatements in 2024 through their review of publicly filed documents filed in lawsuits against PHS in other jurisdictions." *Id.* ¶ 169.

- "PHS, through internal communications amongst numerous named Defendants, admitted internally that its Instruments and SOPs/methods, could not meet certain state requirements, and yet continued to market and sell its Instruments and SOPs/methods as turnkey solutions that would work for every state.  PHS knew, internally, that it should not have sold its Instruments and SOPs/methods in the manner in which they had been sold." *Id.* ¶ 950.

- "Mr. Culver, in May 2023, admitted to a non-party lab in Florida that its deals 'were not above board.'  This admission was not limited to financial terms, but was in response to a lengthy complaint about service, support, and non-functioning Clarus SQ8 GC/MS instruments.  PHS (and by this time PE-US) knew, internally, of its scheme." *Id.* ¶ 951.

Only one of these paragraphs mention Massachusetts at all, and it does so only in reference to meeting Massachusetts regulations.  *See id.* ¶ 165(g).  Similar issues exist with regards to Plaintiffs' other citations.

Where the Complaint references Massachusetts, it generally does so in five ways, aside from allegations related to Assured Testing (which are not at issue in this motion): (1) indicating that certain Defendants are headquartered or based in Massachusetts, Compl. ¶¶ 1, 56–57, 59, 67, 84, 86, 91, 249–50, 253; (2) discussing this Court's jurisdiction, *id.* ¶¶ 100–02; (3) discussing

Massachusetts regulations or laboratory accreditation, *id.* ¶¶ 117, 163, 165(g), 234, 248, 264, 272, 274, 368, 891; (4) explaining that PHS made some sales within Massachusetts, *id.* ¶¶ 107, 237; or (5) making statements of Massachusetts law or bare assertions that the alleged conduct occurred in Massachusetts, *id.* ¶¶ 1016–17, 1021, 1026–27, 1038–39.[17]  These allegations fail to allege that the conduct occurred primarily and substantially within Massachusetts.  *See Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 182 (D. Mass. 2023) ("Only the defendant's unfair and deceptive acts are relevant; other contacts with Massachusetts 'do not play a part in this assessment.'" (quoting *Armstrong v. White Winston Select Asset Funds, LLC,* 2022 WL 17981392, at \*24 (D. Mass. Dec. 27, 2022))); *see also Evergreen*, 2014 WL 304070, at \*4 ("[T]he [complaint], in over thirty pages and seventy-five paragraphs, barely mentions Massachusetts, and when it does, fails to identify a single deceptive act or practice or 'dominant event' that is alleged to have occurred in Massachusetts.").

Instead, most of the Complaint "discusses various conduct that occurred between [Plaintiffs] and [Defendants] without reference to place." *Crunchtime! Info. Sys., Inc. v. Frischs Rests., Inc.*, 768 F. Supp. 3d 183, 186 (D. Mass. 2025) (dismissing Chapter 93A claim for failing to allege that the "claim arose from activities 'primarily and substantially' in Massachusetts").  The fact that PHS conducts business in Massachusetts does not mean that the sales to these Plaintiffs (other than Assured Testing) had any meaningful relationship with Massachusetts, especially where Plaintiffs are not based in Massachusetts.[18]  *See, e.g.*, *Reicher*, 2002 WL 31426758, at \*2

---

[17] A few additional allegations that mention Massachusetts allege only that certain Plaintiffs joined the present action solely for the purposes of asserting RICO claims.  Compl. ¶¶ 877, 916.

[18] *See* Compl. ¶ 107 (alleging that "PHS established a line of business responsible for the production, sourcing, marketing, promotion and sales of cannabis testing laboratory instruments, for regulatory compliance testing of cannabis products . . . in states, including the Commonwealth of Massachusetts, throughout the United States and provinces in Canada which have legalized cannabis for medical and/or recreational adult-use").  Plaintiffs do not allege that any sale took place in Massachusetts, aside from those to Assured Testing.

(noting that the location of the recipient of deception at time of reliance is "of particular import"); *HC&D, LLC v. Precision NDT & Consulting LLC*, 2024 WL 4626223, at *7 (D. Mass. Oct. 30, 2024) (finding inadequate allegations that the "Defendant is headquartered and incorporated in the state and that the [contract] was to be governed by the laws of Massachusetts," where the plaintiff did not "ple[a]d where the misstatements were made," where the misstatements were drafted, or "where Defendant's agents were located when they made the relevant oral misrepresentations" and where plaintiff acted on the representation and made purchases from other states). Similarly, the fact that certain employees involved in the conduct at issue were based in or operating out of Massachusetts at various times does not mean that the conduct occurred primarily and substantially in Massachusetts, where Plaintiffs have alleged a nationwide fraudulent scheme and sales to laboratories who do not operate in Massachusetts and generally fail to specify which employees made which fraudulent statement and when as to reasonably permit the inference that such statements were made from Massachusetts.[19] *See Neural Magic*, 659 F. Supp. 3d at 182–83 (explaining that if the alleged misconduct occurred in multiple jurisdictions, such that "the significant contacts of the competing jurisdictions are approximately in the balance, the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts." (quoting *Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 45 (1st Cir. 2005))).

Plaintiffs also allege that "the development, implementation, management, and oversight of the fraudulent sales and marketing scheme concerning the Instruments, through PHS's directors, officers and employees, including those resident Massachusetts employees identified above, occurred primarily and substantially in Massachusetts." Compl. ¶ 1021. But Plaintiffs do not

---

[19] *See* Compl ¶¶ 1, 56–57, 59, 67, 84, 86, 91, 249–50, 253 (alleging that certain Defendants are headquartered or based in Massachusetts).

22

allege *any* facts to support this conclusory allegation. *See Hewes v. Pangburn*, 162 F.4th 177, 190 (1st Cir. 2025) ([A] formulaic recitation of the elements of a cause of action will not do." (alteration in original) (quoting *Iqbal*, 556 U.S. at 678)). Furthermore, it is not clear such an allegation, if credited, would suffice, where the actual sales and loss appear to have predominantly occurred outside of Massachusetts, in the various states where each Plaintiff was located and operated. *See* Compl. ¶¶ 15–47, 49–55 (alleging that each Plaintiff other than Assured Testing and Green Analytics MA, LLC is or was organized and operated somewhere other than Massachusetts);[20] *id.* ¶¶ 346–877, 889–95, 901–16 (making no allegation that any Plaintiff other than Assured Testing received a false representation or made a purchase in Massachusetts);[21] *id.* ¶ 1018 (alleging that the unfair and deceptive acts are the "false representations that the turnkey instruments and SOPs would be able to accurately and reliably perform cannabis testing that meets all applicable state testing requirements"); *see also Uncle Henry's*, 399 F.3d at 45 (relying on *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622 (1985), for the proposition that, where a "misrepresentation is made in Massachusetts to a third party in another state who relies upon it there," the center of gravity is in the other state, not Massachusetts, and thus affirming grant of summary judgment where "the alleged misrepresentations were received primarily in Maine, where their impact primarily was felt").

---

[20] While Plaintiffs allege that Green Analytics MA, LLC has "a principal place of business located" in Massachusetts, Compl. ¶ 48, Plaintiffs do not actually allege that Green Analytics MA, LLC received or relied on any fraudulent statements or even purchased any lab instrument from any Defendant, *see, e.g.*, *id.* ¶¶ 45–48, 851–57 (making allegations as to all four related "Green Analytics" entities together, without making any specific allegations as to each entity, despite describing the entities as "independently owned and operated cannabis testing labs operating under the Green Analytics brand").

[21] In the allegations that include mention of the location where a false statement was allegedly made, the location is outside of Massachusetts. *See, e.g.*, Compl. ¶ 393 (discussing a meeting that occurred at a conference in California); *id.* ¶¶ 509–10 (same); *id.* ¶ 521 (describing a "meeting . . .with key participants" that occurred in California).

In sum, "[w]hen 'virtually all the conduct that can be said to be unfair or deceptive' occurs outside the Commonwealth, there can be no Chapter 93A liability." *Kenda Corp*, 329 F.3d at 236 (quoting *Kuwaiti*, 438 Mass. at 475). Thus, other than those of Assured Testing, Plaintiffs' Chapter 93A claims must be dismissed.

### b.      Other State Laws

Defendants also argue that Plaintiffs' claims under five foreign consumer protection acts fail. Dkt. 125 at 33–34. Plaintiffs argue only that these arguments are "premature, prior to a ruling on the 'center of gravity' for . . . Plaintiffs' Chapter 93A claims." Dkt. 145 at 35. Plaintiffs provide no authority or explanation as to why Defendants' arguments are premature, and the Court concludes that they are not. Thus, for substantially the reasons set forth by the PerkinElmer Defendants, *see* Dkt. 125 at 33–34, the Court will dismiss those claims under Count VII brought under Connecticut, Maine, Ontario, British Columbia, and Texas law.

24

### 3.    Statute of Limitations (Counts I–VII)

The PerkinElmer Defendants argue that many of Plaintiffs' claims are time-barred.[22] Dkt. 125 at 36–46.  The parties agree that there is a four-year statute of limitations for RICO, Chapter 93, and implied warranty claims (Claims IV–VI) and a three-year statute of limitations for fraud and negligent misrepresentation claims (Counts II and III).  *Id.* at 36, 42–44; Dkt. 145 at 36.  The Arizona and Oregon statutes of limitations for consumer protection claims are both one year (Count VII).  Ariz. Rev. Stat. § 12-541(5); Or. Rev. Stat. § 646.638(6).[23]

Massachusetts applies the "discovery rule" to tort, misrepresentation, and Chapter 93A claims, under which "a cause of action accrues when the plaintiff discovers or with reasonable

---

[22] For Count I, the PerkinElmer Defendants argue that claims brought by Evio, Inc.; Pride Analytics and Consulting LLC; NCALC, LLC d/b/a The Higher Commitment Analytical; High Sierra Analytics, Inc.; 2 River Labs; American Biotech Testing, Inc.; American Biotech Laboratories, Inc.; SC Laboratories Oregon LLC; SC Laboratories California, LLC; CanMedLabs LLC; Agricor Laboratories MI, Inc. f/k/a Cann Lab LLC; The Spott Laboratory; Higher Testing, LLC; Rose City Laboratories LLC; Bluebonnet Labs, LLC; High North, Inc.; OK Analytical; Delta9 Labs, LLC; Nascient, LLC; and Nascient I, LLC should be dismissed.  Dkt. 125 at 36–42.  For Counts II and III, the PerkinElmer Defendants argue that Plant Safe, LLC; Evio, Inc.; Nature Safe Labs, Inc.; Pride Analytics and Consulting LLC; NCALC, LLC d/b/a The Higher Commitment Analytical; High Sierra Analytics, Inc.; 2 River Labs; American Biotech Testing, Inc.; American Biotech Laboratories, Inc.; SC Laboratories Oregon LLC; SC Laboratories California, LLC; CanMedLabs LLC; Agricor Laboratories MI, Inc. f/k/a Cann Lab LLC; The Spott Laboratory; Higher Testing, LLC; Rose City Laboratories LLC; Pinnacle Analytics, LLC; Bluebonnet Labs, LLC; High North, Inc.; OK Analytical; Delta9 Labs, LLC; Nascient, LLC; and Nascient I, LLC should be dismissed.  *Id.* at 43–44.  For Counts IV and V, the PerkinElmer Defendants argue that claims brought by Evio, Inc.; Pride Analytics and Consulting LLC; NCALC, LLC d/b/a The Higher Commitment Analytical; American Biotech Testing, Inc.; American Biotech Laboratories, Inc.; SC Laboratories Oregon LLC; SC Laboratories California, LLC; CanMedLabs LLC; Agricor Laboratories MI, Inc. f/k/a Cann Lab LLC; The Spott Laboratory; Higher Testing, LLC; Rose City Laboratories LLC; High North, Inc.; OK Analytical; Delta9 Labs, LLC; Nascient, LLC; and Nascient I, LLC should be dismissed.  *Id.* at 44–45.  For Counts VI and VII, the PerkinElmer Defendants argue that claims brought by Plant Safe, LLC; Evio, Inc.; Pride Analytics and Consulting LLC; NCALC, LLC d/b/a The Higher Commitment Analytical; High Sierra Analytics, Inc.; 2 River Labs; American Biotech Testing, Inc.; American Biotech Laboratories, Inc.; SC Laboratories Oregon LLC; SC Laboratories California, LLC; CanMedLabs LLC; Agricor Laboratories MI, Inc. f/k/a Cann Lab LLC; The Spott Laboratory; Higher Testing, LLC; Rose City Laboratories LLC; Pinnacle Analytics, LLC; Bluebonnet Labs, LLC; High North, Inc.; OK Analytical; Delta9 Labs, LLC; Nascient, LLC; and Nascient I, LLC should be dismissed.  *Id.* at 42–43.

[23] For the state law claims (Counts II–VII), this Court must determine which state's laws apply.  *See Hoyos v. Telecorp Commc'ns, Inc.*, 488 F.3d 1, 5 (1st Cir. 2007) ("[A] federal court . . . exercising supplemental jurisdiction over state law claims must apply [the forum] state substantive law.").  Plaintiffs do not appear to dispute Defendants' choice-of-law analysis, *see* Dkt. 145 at 35–38 (making no mention of choice-of-law, but discussing only Massachusetts' statute of limitations), and the Court may thus "forego independent analysis of the choice-of-law issue," *Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st Cir. 2020) (quoting *Bird v. Centennial Ins. Co.*, 11 F.3d 228, 231 n.5 (1st Cir. 1993)).

diligence should have discovered that (1) [she] has suffered harm; (2) [her] harm was caused by the conduct of another; and (3) the defendant is the person who caused that harm."[24] *Davalos v. Bay Watch, Inc.*, 494 Mass. 548, 552 (2024) (alterations in original) (quoting *Magliacane v. City of Gardner*, 483 Mass. 842, 851 (2020)) (applying discovery rule to tort claims); *see also Shea v. Ditech Fin. LLC*, 812 F. App'x 7, 10 (1st Cir. 2020) (applying discovery rule to Chapter 93A claims); *Friedman v. Jablonski*, 371 Mass. 482, 485 (1976) (applying discovery rule to fraudulent misrepresentation claim). Similarly, RICO claims accrue "'when a plaintiff knew or should have known of [her] injury' . . . 'even if the plaintiff is unaware of the precise acts of racketeering that caused the injury.'" *Álvarez-Maurás v. Banco Popular of P.R.*, 919 F.3d 617, 625–26 (1st Cir. 2019) (first quoting *Rodriguez v. Banco Cent.*, 917 F.2d 664, 666 (1st Cir. 1990); and then quoting *Lares Grp., II v. Tobin*, 47 F. Supp. 2d 223, 230 (D.R.I. 1999), *aff'd*, 221 F.3d 41 (2000)).

Plaintiffs argue that they did not discover that the representations were fraudulent until 2024, "when they first accessed public litigation records from other lawsuits against PHSI, and first discovered the scope of PHSI's deception."[25] Dkt. 145 at 37 (citing Compl. ¶¶ 8, 922, 931–32, 969). But "[t]he discovery rule . . . imposes a 'duty to investigate' on a plaintiff who has cause for concern." *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 188 (1st Cir. 2006) (quoting *Doucette v. Handy & Harmon*, 35 Mass. App. Ct. 724, 726 (1994)). Here, Plaintiffs specifically allege that they

---

[24] Additionally, Plaintiffs do not dispute that the discovery rule does not apply to implied warranty claims, *see* Dkt. 145 at 36–37, which accrue "when the breach occurs"—which is "when tender of delivery is made"—"regardless of the aggrieved party's lack of knowledge of the breach," subject to exceptions not relevant here, Mass. Gen. Laws ch. 106, § 2-725; *see also Nemirovsky v. Daikin N. Am., LLC*, 488 Mass. 712, 727 (2021) (declining to extend discovery rule to breach of warranty claims because it would undermine purpose of Mass. Gen. Laws ch. 106, § 2-725). For those Plaintiffs at issue in for this argument, each purchase was made more than four years prior to the filing of this suit.

[25] Plaintiffs frame the PerkinElmer Defendants' position as "tantamount to an admission that, 'we lied to you from the beginning, but you did not sue us fast enough.'" Dkt. 145 at 37. While Defendants have not admitted to any such lies, that is precisely how statutes of limitations work. *See Trafon Grp., Inc. v. Butterball, LLC*, 820 F.3d 490, 495 (1st Cir. 2016) ("By their very nature, limitations periods punish plaintiffs who sit on their rights once they have the requisite knowledge to assert a claim.").

identified issues with the lab instruments or SOPs soon after installation, which in many cases occurred long before the relevant statute of limitations expired. *See, e.g.*, Compl. ¶¶ 481–82 (alleging that Plaintiff High Sierra Analytics had its lab instrument installed on Nov. 7, 2018, and "[f]rom the beginning the instrument did not perform as advertised").[26]  It is thus not reasonable to infer from the Complaint that "Plaintiffs were unable to discover the concealment and fraud until public filings in different, later-filed cases became available." Dkt. 145 at 37; *see also Shea*, 812 F. App'x at 10 ("Under Massachusetts law, however, 'accrual under the discovery rule is not delayed until a plaintiff learns that [s]he was *legally* harmed.'" (alteration and emphasis in original) (quoting *Harrington v. Costello*, 467 Mass. 720, 729 (2014))); *RTR Techs., Inc. v. Helming*, 707 F.3d 84, 90 (1st Cir. 2013) (stating that "the running of the statute of limitations is delayed while the facts, as distinguished from the legal theory for the cause of action, remain inherently unknowable to the injured party" (internal quotation marks omitted) (quoting *Catrone v. Thoroughbred Racing Ass'ns of N. Am., Inc.,* 929 F.2d 881, 885 (1st Cir. 1991))).

Plaintiffs also argue that the statute of limitations should be tolled due to fraudulent concealment.[27]  Dkt. 145 at 37–38; *see also Magliacane*, 483 Mass. at 851 ("Where there is fraudulent concealment, the common-law discovery rule gives way to the statutory discovery rule set forth in [Mass. Gen. Laws] c. 260, § 12."); *Álvarez-Maurás*, 919 F.3d at 626 (recognizing that the doctrine of fraudulent concealment may be applied to RICO claims to toll the statute of

---

[26] *See also* Compl. ¶¶ 164(e), 348, 358–60, 366, 380–83, 389, 390, 392, 406, 413–17, 425, 434, 446, 450–51, 466, 473, 499–500, 521–23, 550, 564–67, 572, 581–82, 599, 607–08, 637, 641, 693, 702–03, 728, 757, 777, 779, 781, 783, 791, 796–97, 811, 860, 903–04, 912–13, 915 (alleging Plaintiffs noticed and raised issues with the lab instruments shortly after delivery of the instruments).

[27] Plaintiffs also argue that fraudulent concealment is a "a fact-based inquiry not suitable to be decided at this juncture."  Dkt. 145 at 37.  But dismissal is appropriate where the complaint "and . . . other properly considered documents" failed "to sketch a factual predicate that would provide a basis for tolling the statute of limitations." *Abdallah v. Bain Cap. LLC*, 752 F.3d 114, 119 (1st Cir. 2014) (citations omitted).

limitations "during such time that the perpetrator purposefully and successfully conceals his or her misconduct from its victim."). As a threshold matter, to sufficiently allege fraudulent concealment, a plaintiff must "plead with particularity the facts giving rise to the fraudulent concealment claim" pursuant to Rule 9(b). *Epstein*, 460 F.3d at 189 (quoting *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996)). The Complaint wholly fails to detail with *any* specificity the alleged misrepresentations, let alone "the time, place, and content of the alleged false or fraudulent representations" made to each Plaintiff. *Id.* at 189–90 (quoting *Powers v. Bos. Cooper Corp.*, 926 F.2d 109, 111 (1st Cir. 1991)); *see, e.g.*, Compl. ¶¶ 917–32 (alleging fraudulent concealment and other bases for tolling without specificity).

Furthermore, tolling for fraudulent concealment does not apply when "the plaintiff has actual knowledge of the claim." *Magliacane*, 483 Mass. at 852. "Massachusetts courts impute knowledge to a plaintiff when she 'had the means to acquire [the] facts, in circumstances where the probability of wrongdoing was so evident that possession of the means was equivalent to actual knowledge.'" *City of Bos. v. Express Scripts, Inc.*, 765 F. Supp. 3d 31, 42–43 (D. Mass. 2025) (alteration in original) (quoting *Magliacane*, 483 Mass. at 852), *aff'd sub nom.*, *City of Bos. v. OptumRx, Inc.*, 169 F.4th 58 (1st Cir. 2026). As stated above, Plaintiffs have alleged that they were injured when the instruments and methods supplied by PHS "were never completely functional," "did not work as represented," and "experienced SIGNIFICANT problems *from the very beginning*." Compl. ¶¶ 446, 468 (emphasis added); *see also, e.g., id.* ¶¶ 358–59, 379–83, 392, 413–17, 481, 728 (same). Based on these allegations, Plaintiffs themselves alleged that they had sufficient notice that the lab instruments did not work as promised, which should have triggered an investigation of some kind. *See Álvarez-Maurás*, 919 F.3d at 628 ("[W]hat is determinative in [plaintiff's] case is that, despite [defendant's] stonewalling, there were enough warning signs to

28

put [plaintiff], or a reasonable investor in his situation, on notice that something was seriously amiss, that is, '[w]hen telltale warning signs augur that fraud is afoot, . . . such signs, if sufficiently portentous, may as a matter of law be deemed to alert a reasonable investor to the possibility of fraudulent conduct.'" (final two alterations in original) (quoting *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002))).[28]

### 4.     Remaining Arguments

The PerkinElmer Defendants make additional arguments for dismissal specifically as to claims by First THC Company LLC; Green Analytics MD, LLC; Green Analytics NY, LLC; Green Analytics WV, LLC; Green Analytics MA, LLC; American Biotech Testing, Inc.; and American Biotech Laboratories, Inc.  Dkt. 125 at 20–21, 37–38; Dkt. 151 at 12–13.

As to First THC Company LLC; Green Analytics MD, LLC; Green Analytics NY, LLC; Green Analytics WV, LLC; and Green Analytics MA, LLC; the PerkinElmer Defendants argue that none of these Plaintiffs make any allegations against any Defendant at all.  *E.g.*, Dkt. 151 at 12.  Plaintiffs contend that "Bluebonnet and First THC are related limited liability companies, sharing the same claim" and that "The Green Analytics Plaintiff laboratories were sold to together/collectively by Defendants" and thus "share the claim[s] presented."  Dkt. 145 at 27–29. But the Complaint lacks such assertions, let alone sufficient allegations to state a claim as to these Defendants.  The only allegation related to First THC Company LLC concerns communications by "Pharmlabs Texas," which Plaintiffs describes as "First THC Company" without any explanation of the relationship between the entities.  Compl. ¶ 306.  And Plaintiffs allege that each Green Analytics entity "is one of eight independently owned and operated cannabis testing labs

---

[28] For brevity, the Court does not apply this analysis to each claim separately, instead focusing on Plaintiffs specific arguments.  For substantially the reasons set forth by the PerkinElmer Defendants, *see* Dkt. 125 at 42–46, the Court's conclusions result in the dismissal of Count I–VII as to the Plaintiffs listed above, *see supra* note 22.

operating under the Green Analytics brand." *Id.* ¶¶ 45–48. "There are no factual allegations to flesh out the key elements of [*any*] claim," such as whether each entity made any purchase from PHS and when, "and, as a matter of general practice, a complaint that merely tenders naked assertions devoid of further factual enhancement does not suffice to state a claim." *Kirby v. Petit*, 2025 WL 2409905, at *9 (D. Mass. June 24, 2025) (cleaned up) (emphasis added) (quoting *Iqbal*, 556 U.S. at 678), *report and recommendation adopted sub nom.*, *Kirby v. Wiseman*, 2024 WL 6475951 (D. Mass. July 23, 2025). As such, all claims brought by First THC Company LLC; Green Analytics MD, LLC; Green Analytics NY, LLC; Green Analytics WV, LLC; and Green Analytics MA, LLC are dismissed.

As the Court has already determined that all claims brought by American Biotech Testing, Inc. and American Biotech Laboratories, Inc. must be dismissed, the Court need not and does not address the PerkinElmer Defendants' arguments as to *res judicata*.

### C.     New Mountain Defendants' Motion

The Complaint asserts only one claim against the New Mountain Defendants: Count I. Having concluded that the Complaint fails to state a claim for Count I against all Defendants for failing to plead a RICO enterprise, *see supra* Section III.A, the Court will not address the New Mountain Defendants' additional arguments for dismissal.

### D.     Leave to Amend

Plaintiffs have requested leave to amend the Complaint should the Court grant any or part of Defendants' motions to dismiss. Dkt. 145 at 39–40. Federal Rule of Civil Procedure 15(a) instructs that leave to amend be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). "But this does not mean . . . that a trial court must mindlessly grant every request for leave to amend." *Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Ints. in Int'l & Foreign Cts.*, 87 F.4th 62, 80 (1st Cir. 2023) (alteration in original) (quoting *Nikitine v. Wilmington*

*Tr. Co.*, 715 F.3d 388, 390 (1st Cir. 2013)).  The "grounds for denying leave include 'undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . [and] futility of amendment." *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 60 (1st Cir. 2018) (alterations in original) (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 55–56 (1st Cir. 2008)).  "Appreciable delay alone, in the absence of good reason for it, is enough to justify denying a motion for leave to amend." *Calderón-Serra v. Wilmington Tr. Co.*, 715 F.3d 14, 20 (1st Cir. 2013).

Here, Plaintiffs have already amended their complaint twice and gone through two full rounds of briefing on motions to dismiss since filing their initial complaint in state court approximately fifteen months ago.[29]  In this situation, where Plaintiffs have long had notice of potential deficiencies in their case through the previous motion to dismiss—let alone the current motion—and have had ample opportunities to address such deficiencies, the liberal standard of Rule 15 must give way to finality.  *See United States ex rel. Flanagan v. Fresenius Med. Care Holdings, Inc.*, 142 F.4th 25, 38 (1st Cir. 2025) ("[W]e have explicitly condemned a 'wait and see' approach to pleading, whereby plaintiffs 'having the needed information, deliberately wait in the wings with another amendment to a complaint should the court hold the first amended complaint was insufficient.'" (alteration in original) (quoting *Kader*, 887 F.3d at 61)); *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 58 (1st Cir. 2006) (upholding denial of leave to amend when the plaintiff already had opportunity to amend and the only proffered support for granting leave was the general proposition that leave be "freely given when justice so requires," cautioning that Rule 15 does not mean that "a trial court must mindlessly grant every request for leave to amend"); *Pension Tr. v.*

---

[29] The first round of briefing occurred in state court, *see* Dkt. 145 at 9–10 (describing procedural history); Dkt. 31 at 23–24, 291–93, 298–320, 462–76, 481–504 (state court record), and concerned each cause of action at issue in these motions other than the RICO claims.

*J.Jill, Inc.*, 360 F. Supp. 3d 17, 31 n.4 (D. Mass. 2018) (denying leave to amend where "the complaint . . . [was] already the plaintiff's second complaint. . . . [and] in the seven months the motions have been pending, the plaintiff ha[d] not submitted a proposed second amended complaint nor ha[d] plaintiff explained how amending the complaint again would address the issues raised by Defendants' motions to dismiss"); *Calderón-Serra*, 715 F.3d at 20 (affirming denial of motion to amend "filed . . . nearly a year after the commencement of the action and many months after the . . . motions to dismiss had been taken under advisement").

The Court also notes that Plaintiffs have provided no explanation as to what they would include in a third amended complaint that would cure the deficiencies, let alone filed a separate motion to amend.  *See Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 107–08 (1st Cir. 2013) (upholding the denial of a bare request for leave to amend where the request was embedded within an opposition to a motion to dismiss and noting that "litigants should not seriously expect to obtain a remedy without doing the necessary leg work first"); *see also Douglas v. Hirshon*, 63 F.4th 49, 58 (1st Cir. 2023) ("If plaintiffs believe that they need to supplement their complaint with additional facts to withstand a motion to dismiss, they have a readily available tool: a motion to amend the complaint under [Federal Rule of Civil Procedure] 15." (cleaned up)); *Cody v. Conformis, Inc.*, 199 F. Supp. 3d 409, 421 (D. Mass. 2016) ("The plaintiffs request leave to amend their already Amended Complaint to avoid potential dismissal, yet they provide no basis for concluding that there are allegations available to them that might cure the pleading defects of the existing Complaint. The request to be allowed to replead is therefore denied."); *Levitt v. Sonardyne, Inc.*, 2012 WL 5350037, at *2 (D. Me. Oct. 29, 2012) ("If the Plaintiff thought that an amendment could cure the alleged deficiencies, then when the Defendants moved to dismiss, the

Plaintiff should have made a proper motion for leave to amend and spared the opposing party and the Court time and expense dealing with an obsolete pleading.").

As such, Plaintiffs' request for leave to amend is denied.

## IV.    Remand to State Court

Having dismissed Plaintiffs' sole federal law claim—the RICO claim in Count I, as well as the state law claims at issue in these motions—the Court will remand the remaining state law claims to state court for further proceedings.  The decision to remand or exercise supplemental jurisdiction over state law claims after dismissing federal claims "is a 'pragmatic and case-specific' one" at the district court's discretion.  *Delgado v. Pawtucket Police Dep't*, 668 F.3d 42, 48 (1st Cir. 2012) (quoting *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 257 (1st Cir. 1996)); *see also Roche*, 81 F.3d at 256–57 ("In a federal-question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion." (citing 28 U.S.C. § 1367(c)(3)).  When so deciding, the Court "must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity."  *Delgado*, 668 F.3d at 48.  These factors weighed in favor of exercising supplemental jurisdiction over the claims at issue in these motions, which the Court adjudicated above.[30]  That same calculus cuts differently, however, as to those state law claims *not* at issue in these motions.

---

[30] Here, as to the claims at issues in these motions, the state law claims were fully briefed alongside the federal claim, argued, and raised no novel or substantial issues of state law.  Thus, "the Court exercise[d] its discretion to retain supplemental jurisdiction in the interest of judicial economy and in the interest of the litigants obtaining expeditious resolution of the claims."  *King v. Friends of Kelly Ayotte*, 860 F. Supp. 2d 118, 129 (D.N.H. 2012), *aff'd*, 2013 WL 12629523 (1st Cir. Apr. 5, 2013); *see also Disher v. Info. Res., Inc.*, 873 F.2d 136, 141 (7th Cir. 1989) (affirming as "sensibl[e]" a district court's decision to "take a quick look" to determine whether remaining state law claims "could perhaps be wound up then and there") (cited with approval in *Wilber*, 872 F.3d at 23); *Roche*, 81 F.3d at 257 ("In 'an appropriate situation, a federal court may retain jurisdiction over state-law claims notwithstanding the early demise of all foundational federal claims.'" (quoting *Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995))).

For those remaining claims, this case is the "usual case" in which supplemental jurisdiction over the remaining state law claims is not appropriate. *See Rivera-Díaz v. Humana Ins. of P.R., Inc.*, 748 F.3d 387, 392 (1st Cir. 2014) ("The Supreme Court has made pellucid 'that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" (alteration in original) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988))). This case is at a very early stage in the life cycle of a case, so there is no reason for this Court to hold on to the state law claims not at issue in these motions, which no court has had the opportunity to review. *Cf. Redondo Constr. Corp. v. Izquierdo*, 662 F.3d 42, 50 (1st Cir. 2011) (explaining that "the age and advanced stage of the litigation" and "the enormous expense [the plaintiff] would incur in redoing the discovery and trial preparation" made the discretionary refusal to exercise jurisdiction over the local-law claims "both wasteful and enormously harmful to [the plaintiff]"); *Roche*, 81 F.3d at 257 ("[T]he district court's resolve to go forward with the state-law claims fell squarely within the realm of its discretion. The litigation had matured well beyond its nascent stages, discovery had closed, [and] the summary judgment record was complete."). As such, the Court REMANDS the balance of the case to state court.

## V.    Conclusion

For the foregoing reasons, the PerkinElmer Defendants' motion to dismiss, Dkt. 124, and the New Mountain Defendants' motion to dismiss, Dkt. 126, are GRANTED and Plaintiffs' motions for default judgment as to Juniper and Emerald, Dkts. 155–56, are DENIED. Plaintiffs' claims are dismissed with prejudice as follows:

- Count I is dismissed as to all Defendants;

34

- Claims under Count II brought by Plant Safe, LLC; Evio, Inc.; Nature Safe Labs, Inc.; Pride Analytics and Consulting LLC; NCALC, LLC d/b/a The Higher Commitment Analytical; High Sierra Analytics, Inc.; 2 River Labs; American Biotech Testing, Inc.; American Biotech Laboratories, Inc.; SC Laboratories Oregon LLC; SC Laboratories California, LLC; CB Labs Novato, LLC; CB Labs Santa Ana, LLC; CanMedLabs LLC; Enve Analytics LLC; Aries Analytic L.L.C.; Agricor Laboratories MI, Inc. f/k/a Cann-Lab LLC; Vassar Acquisitions Property Management LLC; The Spott Laboratory; Scepter Lab LLC; Higher Testing, LLC; Jasper Analytical Laboratory, LLC; Rose City Laboratories; Pinnacle Analytics, LLC; Bluebonnet Labs, LLC; First THC Company LLC; High North, Inc.; Pura Analytical Labs; Green Analytics MD, LLC; Green Analytics New York, LLC; Green Analytics West Virginia, LLC; Green Analytics Massachusetts, LLC; OK Analytical; Tagleaf, Inc.; Delta9 Labs, LLC; Nascient, LLC; and Nascient I, LLC are dismissed.

- Claims under Count III brought by Plant Safe, LLC; Evio, Inc.; Nature Safe Labs, Inc.; Pride Analytics and Consulting LLC; NCALC, LLC d/b/a The Higher Commitment Analytical; High Sierra Analytics, Inc.; 2 River Labs; American Biotech Testing, Inc.; American Biotech Laboratories, Inc.; SC Laboratories Oregon LLC; SC Laboratories California, LLC; CanMedLabs LLC; Agricor Laboratories MI, Inc. f/k/a Cann Lab LLC; The Spott Laboratory; Higher Testing, LLC; Rose City Laboratories LLC; Pinnacle Analytics, LLC; Bluebonnet Labs, LLC; First THC Company LLC; High North, Inc.; Green Analytics MD, LLC; Green Analytics New York, LLC; Green Analytics West Virginia, LLC; Green Analytics Massachusetts, LLC; OK Analytical; Delta9 Labs, LLC; Nascient, LLC; and Nascient I, LLC are dismissed.

- Claims under Counts IV and V brought by Evio, Inc.; Pride Analytics and Consulting LLC; NCALC, LLC d/b/a The Higher Commitment Analytical; American Biotech Testing, Inc.; American Biotech Laboratories, Inc.; SC Laboratories Oregon LLC; SC Laboratories California, LLC; CanMedLabs LLC; Agricor Laboratories MI, Inc. f/k/a Cann Lab LLC; The Spott Laboratory; Higher Testing, LLC; Rose City Laboratories LLC; First THC Company LLC; High North, Inc.; Green Analytics MD, LLC; Green Analytics New York, LLC; Green Analytics West Virginia, LLC; Green Analytics Massachusetts, LLC; OK Analytical; Delta9 Labs, LLC; Nascient, LLC; and Nascient I, LLC are dismissed.
- All claims under Counts VI other than those of Assured Testing are dismissed;

35

- All claims under Count VII brought under Connecticut, Maine, Ontario, British Columbia, and Texas law, as well as those claims brought by Plant Safe, LLC; Evio, Inc.; Pride Analytics and Consulting LLC; NCALC, LLC d/b/a The Higher Commitment Analytical; High Sierra Analytics, Inc.; 2 River Labs; American Biotech Testing, Inc.; American Biotech Laboratories, Inc.; SC Laboratories Oregon LLC; SC Laboratories California, LLC; CB Labs Novato, LLC; CB Labs Santa Ana, LLC; CanMedLabs LLC; Enve Analytics LLC; Aries Analytic L.L.C.; Agricor Laboratories MI, Inc. f/k/a Cann Lab LLC; Vassar Acquisitions Property Management LLC; The Spott Laboratory; Scepter Lab LLC; Higher Testing, LLC; Jasper Analytical Laboratory, LLC; Rose City Laboratories LLC; Pinnacle Analytics, LLC; Bluebonnet Labs, LLC; First THC Company LLC; High North, Inc.; Pura Analytical Labs; Green Analytics MD, LLC; Green Analytics New York, LLC; Green Analytics West Virginia, LLC; Green Analytics Massachusetts, LLC; OK Analytical; Tagleaf, Inc.; Delta9 Labs, LLC; Nascient, LLC; and Nascient I, LLC are dismissed.

As such, Plaintiffs Evio, Inc.; Pride Analytics and Consulting LLC; NCALC, LLC d/b/a The Higher Commitment Analytical; American Biotech Testing, Inc.; American Biotech Laboratories, Inc.; SC Laboratories Oregon LLC; SC Laboratories California, LLC; CanMedLabs LLC; Agricor Laboratories MI, Inc. f/k/a Cann Lab LLC; The Spott Laboratory; Higher Testing, LLC; Rose City Laboratories LLC; First THC Company LLC; High North, Inc.; Green Analytics MD, LLC; Green Analytics New York, LLC; Green Analytics West Virginia, LLC; Green Analytics Massachusetts, LLC; OK Analytical; Certified Testing & Data, LLC; Tagleaf, Inc.; Delta9 Labs, LLC; Nascient, LLC; and Nascient I, LLC are dismissed from the case.

The case is hereby REMANDED to state court for further proceedings.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated: May 13, 2026                     Judge, United States District Court